**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| STOURBRIDGE INVESTMENTS LLC, Derivatively on Behalf of Nominal Defendant THE WALT DISNEY COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT A. CHAPEK, CHRISTINE M. MCCARTHY, KAREEM DANIEL, SUSANE E. ARNOLD, MARY T. BARRA, SAFRA A. CATZ, AMY L. CHANG, FRANCIS A. DESOUZA, MICHAEL B.G. FROMAN, ROBERT A. IGER, MARIA ELENA LAGOMASINO, CALVIN R. MCDONALD, MARK G. PARKER, and DERICA W. RICE,<br><br>Defendants,<br><br>and<br><br>THE WALT DISNEY COMPANY,<br><br>Nominal Defendant. | Case No. |

**<u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>**

By and through his undersigned counsel, Plaintiff Stourbridge Investments LLC ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant The Walt Disney Company ("Disney" or the "Company") and against certain current and former officers and directors of the Company for: (i) violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder; (ii) breaches of fiduciary duties; (iii) breach of fiduciary duty for insider trading; (iv) unjust enrichment; and (v) waste of corporate assets. Plaintiff makes these allegations upon personal

1

knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Disney and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on Disney's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated securities fraud class action lawsuit captioned *Local 272 Labor-Management Pension Fund, et al. v. The Walt Disney Company, et al.*, Case No. 23-cv-03661 (C.D. Cal.) (the "Related Securities Action"); and (e) review of other publicly-available information concerning Disney and the Defendants.

## NATURE OF THE ACTION

1.      Plaintiff brings this action derivatively for the benefit of Nominal Defendant Disney against certain of the Company's current executive officers and directors aiming to rectify the Defendants' violations of the Exchange Act and breaches of fiduciary duties for issuing false and misleading statements and/or omitting material information in the Company's public filings and proxy statements from approximately December 10, 2020 to the present (the "Relevant Period").[1]

2.      The Walt Disney Company (originally known as Disney Brothers Cartoon Studio) was founded in 1923 by brothers Walt and Roy Disney. The Company, a Delaware corporation headquartered in Burbank, California, is the world's largest entrainment group. The Company, together with its subsidiaries, engages in the film and episodic television content production and

---

[1] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from approximately December 10, 2020 to November 8, 2022; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

distribution business; operates television networks under the ABC, Disney, ESPN, Freeform, FX, Fox, National Geographic, and Star brands; and runs studios that produce films under the Walt Disney Pictures, 20th Century Studios, Marvel, Lucasfilm, Pixar, and Searchlight Pictures banners.

3.      The Company also offers direct-to-consumer ("DTC" or "D2C") streaming services through Disney+, Disney+ Hotstar, ESPN+, Hulu, and Star+; sells and licenses film and television content to third-party television and subscription video-on-demand services; operates theatrical, home entertainment, and music distribution services; stages and licenses live entertainment events; and offers post-production services by Industrial Light & Magic and Skywalker Sound.

4.      In February 2020, Disney announced that then-CEO Iger would be stepping down after a storied, 15-year career leading the Company. Iger assumed the role of Executive Chairman and was to direct the Company's creative endeavors, while leading the Board and providing the benefit of his experience, leadership, and guidance through the end of his contract on December 31, 2021.

5.      Iger reportedly handpicked Chapek, who had worked under Iger for more than a decade, as his successor. "With the successful launch of Disney's direct-to-consumer businesses and the integration of Twenty-First Century Fox well underway, I believe this is the optimal time to transition to a new CEO," Iger said at the time. "I have the utmost confidence in Bob and look forward to working closely with him over the next 22 months as he assumes this new role and delves deeper into Disney's multifaceted global businesses and operations, while I continue to focus on the Company's creative endeavors."

6.      Just one month after Chapek became CEO, the COVID-19 coronavirus spread rapidly around the globe – with the World Health Organization officially declaring it a pandemic

in March 2020. In response, many countries enacted various forms of lockdowns restricting their citizens' movement and work in an effort to contain the spread of the virus.

7.     In October 2020, Disney announced a major reorganization of the Company's media and entertainment operations. The new structure was reportedly designed to further accelerate the Company's focus on a DTC strategy, in light of the rapid success of Disney+. As defendant Chapek explained in an interview on CNBC, the reorganization was intended to "accelerate our transition to a real direct-to-consumer priority company." He continued: "We believe that we've got the opportunity to build upon the success of Disney+, which by almost any measure has been far and above anybody's expectations and really use this to catalyze our growth and increase shareholder wealth."

8.     Disney issued a press release that similarly characterized the pivot as being based on the success of Disney+, stating in relevant part as follows:

> ***In light of the tremendous success achieved to date in the Company's direct-to-consumer business and to further accelerate its DTC strategy, The Walt Disney Company today announced a strategic reorganization of its media and entertainment businesses.*** Under the new structure, Disney's world-class creative engines will focus on developing and producing original content for the Company's streaming services, as well as for legacy platforms, while distribution and commercialization activities will be centralized into a single, global Media and Entertainment Distribution organization. The new Media and Entertainment Distribution group will be responsible for all monetization of content – both distribution and ad sales – and will oversee operations of the Company's streaming services. It will also have sole P&L accountability for Disney's media and entertainment businesses.[2]

9.     The reorganization represented a dramatic departure from Disney's historical reporting structure and was hugely controversial within the Company because it took power away from creative content-focused executives and centralized it in a new reporting group led by defendant Daniel who reported directly to defendant Chapek. Prior to the announcement, the

---

[2] Emphasis has been added unless otherwise noted.

Company was organized into four reporting segments: (i) Media Networks; (ii) Parks, Experiences and Products; (iii) Studio Entertainment; and (iv) Direct-to-Consumer & International. Chapek reorganized the Company into just two reporting segments: (i) Disney Media and Entertainment Distribution ("DMED"); and (ii) Disney Parks, Experiences and Products ("DPEP").

10.     Following the reorganization, the distribution and commercialization activities of the Company's media and entertainment operations were centralized into a single reporting segment, namely DMED. DMED's operating results were in turn reported across three distribution platforms/significant lines of business: (i) Direct-to-Consumer (*i.e.*, streaming); (ii) Linear Networks (*i.e.*, cable and broadcast television networks); and (iii) Content Sales/Licensing (primarily comprising theatrical, home entertainment, and third-party television and subscription video-on-demand ("TV/SVOD") distribution globally).

11.     Thus, DMED became responsible for the monetization of all Disney content globally – both distribution and advertising sales – and oversaw the operations of the Company's streaming services. With this new structure, Chapek removed budgetary and distribution control from the heads of Disney's content groups (much to their dismay) and placed control in the hands of DMED's new Chairman, defendant Daniel, who reported directly to his long-time mentor Chapek. Daniel oversaw the profit and loss management, distribution, operations, sales, advertising, data, and technology functions for all of the Company's content worldwide. In this way, defendants Daniel and Chapek exerted near complete control over the Company's strategic decisions around content.

12.     Critically, DMED was responsible for determining which platform the Company's content would be released on, whether it be a streaming service, a television network, or traditional movie theaters. "There is a seismic shift happening in the marketplace, and you can either lead or

follow and we chose to lead," Chapek said of the Company's push into streaming, adding that the focus is now on "what platform is best to meet those consumer needs."

13.     "Given the incredible success of Disney+ and our plans to accelerate our direct-to-consumer business, we are strategically positioning our Company to more effectively support our growth strategy and increase shareholder value," Chapek said at the time. Chapek further explained that:

> Managing content creation distinct from distribution will allow us to be more effective and nimble in making the content consumers want most, delivered in the way they prefer to consume it. Our creative teams will concentrate on what they do best – making world-class franchise-based content – while our newly centralized global distribution team will focus on delivering and monetizing that content in the most optimal way across all platforms, including Disney+, Hulu, ESPN+ and the coming Star International streaming service.

14.     During the Relevant Period, Defendants repeatedly misled investors about the success of the Disney+ platform by concealing the true costs of the platform, concealing the expense and difficulty of maintaining robust Disney+ subscriber growth, and claiming that the platform was on track to achieve profitability and 230-260 million paid global subscribers by the end of fiscal year 2024. Specifically, Defendants used the newly created DMED to inappropriately shift costs out of the Disney+ platform and onto legacy platforms.

15.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Disney's securities, Plaintiff and the Company have suffered significant losses and damages.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to the subject matter of this action pursuant to 28 U.S.C. § 1331 because the claims arise under and pursuant to §10(b) of the Exchange Act and Rule 10(b)-5 promulgated thereunder.

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a), as they relate to Plaintiff's claims under 15 U.S.C. §78n(a).

18.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), because a substantial portion of the transactions and wrongs complained of herein occurred in this District and defendants have received substantial compensation within this District by doing business here and engaging in numerous activities that had an effect in this jurisdiction.

## THE PARTIES

19.     Plaintiff has been a shareholder during the Relevant Period and has continuously held shares of Disney common stock to present.

20.     Nominal Defendant Disney is incorporated in Delaware and its current principal executive offices are located at 500 South Buena Vista Street, Burbank, California 91521. The Company's common stock trades on the NASDAQ under the symbol "DIS."

21.     Defendant Robert A. Chapek ("Chapek") served as the Company's Chief Executive Officer ("CEO") from February 2020 until his termination on November 20, 2022. For the fiscal years of 2020, 2021, and 2022, Defendant Chapek received $14,163,936, $32,464,293, and $24,183,003 in total compensation, respectively. Defendant Chapek is named as a defendant in the Related Securities Action.

22.     Defendant Christine M. McCarthy ("McCarthy") served as the Company's Chief Financial Officer ("CFO") from 2015 until her resignation in June 2023. For the fiscal years of 2020, 2021, and 2022, Defendant McCarthy received $10,997,005, $21,729,215, and $20,235,669 in total compensation, respectively. Defendant McCarthy is named as a defendant in the Related Securities Action.

23.     Defendant Kareem Daniel ("Daniel") was a long-time employee of Disney that

served as President, Consumer Products, Games and Publishing and Chief of Staff, Officer of the CEO. Prior to his dismissal from Disney on November 21, 2022, Defendant Daniel served as the first and only Chairman of Disney's DMED segment. Defendant Daniel is named as a defendant in the Related Securities Action.

24.     Defendants Chapek, McCarthy, and Daniel are collectively referred to herein as the "Securities Action Defendants."

25.     Defendant Susan E. Arnold ("Arnold") served as a member of the Company's Board from 2007 to April 3, 2023 and as Chairman of the Board from December 31, 2021 to April 3, 2023. Defendant Arnold served as Chair of both the Executive Committee and the Governance and Nominating Committee. In her role as a member of the Board for fiscal years 2020, 2021, and 2022, Defendant Arnold received $364,710, $436,922, and $571,981 in total compensation, respectively.

26.     Defendant Mary T. Barra ("Barra") has been a member of the Company's Board since 2017. Defendant Barra is a member of the Compensation Committee. In her role as a member of the Board for fiscal years 2020, 2021, and 2022, Defendant Barra received $319,702, $364,607, and $361,657 in total compensation, respectively.

27.     Defendant Safra A. Catz ("Catz") has been a member of the Company's Board since 2018 and served as Chair of the Audit Committee up until April 3, 2023. Defendant Catz is a member of the Audit Committee. In her role as a member of the Board for fiscal years 2020, 2021, and 2022, Defendant Catz received $283,591, $389,822, and $439,143 in total compensation, respectively.

28.     Defendant Amy L. Chang ("Chang") has been a member of the Company's Board since May 27, 2021. Defendant Chang is a member of the Governance and Nominating Committee.

In her role as a member of the Board for fiscal years 2021 and 2022, Defendant Chang received $122,685 and $361,657 in total compensation, respectively.

29.     Defendant Francis A. deSouza ("deSouza") has been a member of the Company's Board since 2018. Defendant deSouza is a member of the Audit Committee. In his role as a member of the Board for fiscal years 2020, 2021, and 2022, Defendant deSouza received $300,720, $324,607, and $366,953 in total compensation, respectively.

30.     Defendant Michael B.G. Froman ("Froman") has been a member of the Company's Board since 2018. Defendant Froman is a member of the Governance and Nominating Committee. In his role as a member of the Board for fiscal years 2020, 2021, and 2022, Defendant Froman received $291,837, $383,942, and $433,625 in total compensation, respectively.

31.     Defendant Robert A. Iger ("Iger") has served as the Company's CEO since November 2022. Formerly, he served as the Company's CEO from 2005 to 2020. Additionally, he served as Chairman of the Board and Executive Chairman from 2020 to 2021. For the fiscal years of 2020, 2021, and 2022, Defendant Iger received $21,031,389, $45,899,796, and $14,998,299 in total compensation, respectively.

32.     Defendant Maria Elena Lagomasino ("Lagomasino") has been a member of the Company's Board since 2015. Defendant Lagomasino is a member of the Governance and Nominating Committee and Chair of the Compensation Committee. In her role as a member of the Board for fiscal years 2020, 2021, and 2022, Defendant Lagomasino received $298,771, $354,855, and $396,730 in total compensation, respectively.

33.     Defendant Calvin R. McDonald ("McDonald") has been a member of the Company's Board since 2021. Defendant McDonald is a member of the Compensation Committee. In his role as a member of the Board for fiscal years 2021 and 2022, Defendant McDonald received

$107,685 and $361,657 in total compensation, respectively.

34.     Defendant Mark G. Parker ("Parker") has been a member of the Company's Board since 2016. Defendant Parker is Chair of the Executive Committee, Chair of the Governance and Nominating Committee, and a member of Compensation Committee. In his role as a member of the Board for fiscal years 2020, 2021, and 2022, Defendant Parker received $267,445, $314,607, and $361,657 in total compensation, respectively.

35.     Defendant Derica W. Rice ("Rice") has been a member of the Company's Board since 2019. Defendant Rice is the Chair of Audit Committee. In his role as a member of the Board for fiscal years 2020, 2021, and 2022, Defendant Rice received $364,703, $364,683, and $431,657 in total compensation, respectively.

36.     Defendants Arnold, Barra, Catz, Chang, deSouza, Froman, Iger, Lagomasino, McDonald, Parker, and Rice are collectively referred to herein as the "Director Defendants."

37.     The Director Defendants, along with the Securities Action Defendants are referred to herein collectively as the "Individual Defendants."

38.     Defendant Disney, along with the Individual Defendants are referred to herein collectively as the "Defendants."

39.     Related Party Non-Defendant Carolyn N. Everson ("Everson") is currently a director of Disney. Everson is named solely for purposes of demand futility. Everson joined as a director on November 21, 2022.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

40.     By reason of their positions as officers, directors, and/or fiduciaries of Disney, and because of their ability to control the business and corporate affairs of Disney, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust,

loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Disney in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Disney and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

41.     Each director and officer of the Company owes to Disney and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

42.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

### Duties of the Members of the Audit Committee

43.     Pursuant to the Audit Committee Charter[3] (as amended on December 1, 2021) of Disney, the purpose of the Audit Committee is to:

[A]ssist the Board in its oversight of:

- the integrity of the Company's financial statements;

- the adequacy of the Company's system of internal controls;

- the Company's compliance with legal and regulatory requirements;

- the qualifications and independence of the Company's independent auditors;

- the performance of the Company's independent auditors and the Company's internal audit function (*i.e.* "management audit function"); and

---

[3]     Available at https://thewaltdisneycompany.com/app/uploads/2021/12/Audit-Committee-Charter-2021.pdf.

- to prepare an audit committee report as required by the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

44. Specifically, the Audit Committee has the following duties, among others, with respect to the Company's financial reporting:

- review with management the significant financial reporting issues, judgments and estimates used in developing the financial reports, including analyses of the effects of alternative GAAP methods on the financial statements;

- review the accounting and reporting treatment of significant transactions outside the Company's ordinary operations;

- review with management and the Company's independent auditors significant changes to the Company's accounting principles or their application as reflected in the financial reports;

- review with management and the Company's independent auditors the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company;

- meet periodically with the Company's independent auditors (in private, as appropriate) (a) to review their reasoning in accepting or questioning significant decisions made by management in preparing the financial reports; (b) to review any audit problems or difficulties and management's response; (c) to review any outstanding disagreements with management that would cause them to issue a non-standard report on the Company's accounting principles (including the quality, not just the acceptability, of accounting principles) and the clarity of disclosure practices used or proposed; (e) to determine if any restrictions have been placed by management on the scope of their audit; and (f) to discuss any other matters the Committee deems appropriate;

- meet periodically in private with the Company's management;

- review earnings press releases, as well as financial information and earnings guidance provided to analysts, rating agencies and others, and discuss their appropriateness with management and the Company's independent auditors, paying particular attention to any use of "pro forma" or "adjusted" non-GAAP information;

- review draft quarterly and annual financial statements and discuss their

appropriateness with management and the Company's independent auditors, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the matters required to be discussed by the applicable requirements of the PCAOB and the SEC; and

- consider whether it will recommend to the Board that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K.

45. The Audit Committee has the following duties, among others, with respect to the

Company's internal control:

- inquire of management, management auditors and the Company's independent auditors concerning any deficiencies in the Company's policies and procedures that could adversely affect the adequacy of internal controls and the financial reporting process and review any special audit steps adopted in light of any material control deficiencies and the timeliness and reasonableness of proposed corrective actions;

- review significant management audit findings and recommendations, and management's responses thereto;

- meet periodically with management auditors in private session (without the participation of management or the independent auditors);

- review the Company's policies and practices with respect to risk assessment and risk management;

- review the Company's policies and practices related to compliance with laws, ethical conduct and conflicts of interest;

- review significant cases of conflicts of interest, misconduct or fraud;

- review significant issues between the Company and regulatory agencies;

- review as appropriate material litigation involving the Company;

- review and approve the Company's entry into swaps, including transactions in swaps that are subject to mandatory clearing, and to approve use of the end-user exception from clearing. The Committee is also authorized to adopt and shall review annually thereafter a policy relating to the Company's use of the non-financial end-user exception. The Committee may delegate responsibility for implementation of the non-financial end-user policy to the Company's management, as the Committee deems

appropriate; and

- review cybersecurity and data security risks and mitigation strategies.

46.    The Audit Committee has the following duties, among others, with respect to the Company's receipt of complaints:

The Committee shall establish procedures for:

- the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls and auditing matters; and

- the confidential, anonymous submission by employees of the Company regarding questionable accounting or auditing matters.

47.    Lastly, the Audit Committee is required to "conduct an annual evaluation of its performance in carrying out its responsibilities."

48.    Upon information and belief, the Company maintained versions of the Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

**Duties Pursuant to the Company's Code of Business Code and Ethics for Directors**

49.    The Individual Defendants, as officers and/or directors of Disney, were also bound by the Company's Code of Business Conduct and Ethics for Directors (the "Code")[4] which, according to the Code, sets out basic principles to guide the members of the Board of Disney, who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

50.    Regarding basic general principles of conduct, the Code states that:

---

[4] Available at https://impact.disney.com/app/uploads/2022/01/Code-of-Business-Conduct-and-Ethics-for-Directors.pdf.

The Walt Disney Company is committed to conducting business in accordance with the highest standards of business ethics and complying with applicable laws, rules and regulations. In furtherance of this commitment, the Board promotes ethical behavior, and has adopted this Code.

Every Director must:
(i) represent the interests of the shareholder of The Walt Disney Company;

(ii) exhibit high standards of integrity, commitment and independence of thought and judgment;

(iii) dedicate sufficient time, energy and attention to ensure the diligent performance of his or her duties; and

(iv) comply with every provision of this Code.

51.     Regarding conflicts of interests, the Code states that:

Directors must avoid conflicts of interest. A conflict of interest occurs when an individual's private interest interferes in any way with the interests of the company or any of its subsidiary and affiliated companies. A conflict of interest may also arise when a Director, or a member of his or her immediate family, receives improper personal benefits as a result of his or her position in the Company. Directors should also be mindful of, and seek to avoid, conduct which could reasonably be construed as creating an appearance of a conflict of interest.

While the Code does not attempt to describe all possible conflicts of interests that could develop, the following are examples of conflicts of interest:

(i) receiving loans or guarantees of obligations as a result of one's position as a Director;

(ii) engaging in conduct or activity that improperly interferes with the Company's existing or prospective business relations with a third party;

(iii) accepting bribes, kickbacks or any other improper payments for services relating to the conduct of the business of the Company; and

(iv) accepting, or having a member of a Director's immediate family accept, a gift from persons or entities that deal with the Company, in cases where the gift is being made in order to influence the Directors' actions a member of the Board, or where acceptance of the gift could otherwise reasonably create the appearance of a conflict of interest.

Any question about a Director's actual or potential conflict of interest with the Company should be brought promptly to the attention of the Chairman of the

Governance and Nominating Committee and the Chairman of the Board, who will review the question and determine an appropriate course of action, including whether consideration or action by the full board is necessary. Directors involved in any conflict or potential conflict situations shall recuse themselves from any decision relating thereto.

52.     Regarding use of corporate information, opportunities and assets, the Code states

that:

Directors may not compete with the Company, or use opportunities that are discovered through the use of Company property, Company information or position, for their personal benefit or the benefit of persons or entities outside the Company. No Director may improperly use or waste any Company asset.

53.     Concerning adherence to laws and regulations, the Code states that:

The Company requires strict compliance by all its Directors with applicable laws, rules and regulations. These include federal and other securities laws, including insider trading laws, and the Company's insider trading compliance policies.

54.     Concerning accountability, the Code states that:

The Code referred to herein is mandatory and applies to all Directors, who are accountable for compliance with the Code.

Directors should communicate any suspected violations of this Code promptly to the Chairman of the Governance and Nominating Committee and the Chairman of the Board. Suspected violations will be investigated by or at the direction of the Board or the Governance and Nominating Committee, and appropriate action will be taken in the event that a violation is confirmed.

55.     Upon information and belief, the Company maintained versions of the Code during

the Relevant Period that imposed the same, or substantially and materially the same or similar

duties on, among others, the Individual Defendants, as those set forth above.

**Duties Pursuant to Disney's Standards of Business Conduct**

56.     The Company also maintains "The Walt Disney Company and Affiliated

Companies Standards of Business Conduct" (the "Disney Standards").[5]

---

[5] Available at https://thewaltdisneycompany.com/app/uploads/2022/11/TWDC-Standards-of-Business-Conduct-Nov-2022.pdf.

57.     Regarding the guideline, the Disney Standards state

[it] is resource for employees and Cast Members to 1) report questionable activities – including questionable accounting or auditing matters; 2) report complaints regarding the Company's accounting, internal accounting controls or auditing matters; 3) ask for guidance on any business conduct-related issue; or 4) make the Company aware of any suspected unethical or illegal conduct, or violation of our Standards of Business Conduct or any other Company polices.

58.     Under the Integrity: Our Standards section, the Disney Standards state:

"We do what's right and take responsibility for our actions to protect our guests, our audiences, our consumers and our shareholders."

59.     Regarding the purpose of the Disney Standards, they state:

Why We Have Standards of Business Conduct

The connection we share with people around the world through the content, entertainment and experiences we offer is a privilege, one we must never take for granted. We recognize that our continued success depends upon a commitment to conduct business with honesty, integrity and in compliance with the law everywhere we operate.

Our Standards of Business Conduct (or "Standards") are a reflection of that commitment and provide you with the information you need to do the right thing on the job and preserve the reputation we have earned as an ethical company.

Keep in mind, no document can address every situation you may possibly face in your everyday work. We rely on you to use these Standards as well as your good judgment to guide your behavior and to ask questions if you are ever unsure of the proper course of action.

60.     Regarding basic general principles of conduct, the Disney Standards state that:

As a Cast Member of employee, you have a responsibility to:

- Act with integrity and honesty on the job.

- Comply with all applicable laws and regulations in performing your duties.

- Be familiar with the Standards, follow them at all times and seek help when you have a question.

- Share concerns about any conduct that violates our Standards.

We are committed to compliance with our Standards. Anyone who violates them is subject to disciplinary action, up to and including termination. Remember, one of the best resources for solving an ethical dilemma is your conscience. If an action you're contemplating feels dishonest, unethical or illegal, it probably is.

If you are a supervisor, you have a greater level of responsibility. We look to you to model ethical behavior and promote a workplace where Cast Members and employees feel comfortable coming forward with concerns and questions . . .

61.     Under the Honesty: Our Commitment to the Company and our Shareholders section, the Disney Standards state: "Protecting our reputation requires a commitment to truth and high standards in everything we do."

62.     Regarding conflicts of interest, the Disney Standards state that:

Our business is built on public trust and confidence and an expectation by guests and customers that they can depend on our products and services. To deliver our very best, each of us has an obligation to make objective decisions on behalf of the Company and avoid situations where a conflict (or apparent conflict) exists between the Company's interests and our own, personal interests.

It's impossible to list all of the situations that could present a potential conflict of interest, but there are certain situations where conflicts often arise. It's important that you are familiar with these situations, recognize a potential conflict when you see one and take the appropriate action . . .

63.     Regarding recordkeeping and financial reporting, the Disney Standards state that:

Accurate and complete recordkeeping is essential to the successful operation of our Company, as well as to our ability to meet our legal and regulatory obligations. You have a responsibility to be accurate, complete and honest in what you report and record to meet regulatory requirements, as well as in all Company documents, including accounting records, time cards, expense reports, invoices, payroll records, safety records, business records, performance evaluations, etc.

If you see or suspect financial misconduct, notify your supervisor immediately and contact the Management Audit department or The Guideline . . . You are also responsible to provide accurate information in connection with our financial reporting obligations.

64.     Concerning adherence to laws and regulations, the Disney Standards state that: "We are committed to comply with the law everywhere in the world that we operate."

65.     Concerning inside information and securities trading, the Disney Standards state that:

> As a Cast Member or employee, your job may expose you to material, nonpublic (or "inside") information about our Company or companies with which we do business. Material inside information is information about a company that is not available to the public but, if it were, might influence someone's investment decision about that company. Examples of material inside information include: information about mergers or acquisitions, financial performance, changes in executive management, significant transactions or new projects contemplated.
>
> You may not trade in Company stock or other securities based on material inside information you have about our Company, and you may not trade in the stock of companies we work with if your job exposes you to inside information about those companies. Passing along a "tip" is also a form of insider trading and strictly prohibited. Keep in mind, even the appearance of an improper transaction must be avoided.

66.     Upon information and belief, the Company maintained versions of the Disney Standards during the Relevant Period that imposed the same, or substantially and materially the same or similar duties on, among others, the Individual Defendants, as those set forth above.

**Duties Pursuant to Disney's Corporate Governance Guidelines**

67.     The Company also maintains Corporate Governance Guidelines (the "Disney Guidelines")[6].

68.     Regarding the composition of the Board of Directors, the Disney Guidelines state:

> "It is the policy of the Board that the Board at all times reflect the following characteristics. Each Director shall at all times represent the interests of the shareholders of the Company. Each Director shall at all times exhibit high standards of integrity, commitment and independence of thought and judgment . . ."

69.      Regarding the Board conduct and review, the Disney Guidelines state:

> Members of the Board shall act at all times in accordance with the requirements of the Company's Code of Business Conduct and Ethics for Directors. This obligation shall at all times include, without limitation, strict adherence to the Company's policies with respect to conflicts of interest, confidentiality, protection of the

---

[6] Available at https://thewaltdisneycompany.com/app/uploads/2022/09/Corporate-Governance-Guidelines-Sept-2022.pdf.

Company's assets, ethical conduct in all business dealings and respect for and compliance with applicable law. Any waiver of the requirements of the Code of Business Conduct and Ethics for Directors with respect to any individual Director shall be reported to, and be subject to the approval of, the Board.

The Board shall conduct an annual review and evaluation of its conduct and performance based upon participation by all Directors in an evaluation that includes, among other things, an assessment of:

    a.   the Board's composition and independence;

    b.   the Board's access to and review of information from management, and the quality of such information;

    c.   the Board's responsiveness to shareholder concerns;

    d.   maintenance and implementation of the Company's standards of conduct; and

    e.   maintenance and implementation of these Guidelines.

70.    Upon information and belief, the Company maintained versions of the Disney Guidelines during the Relevant Period that imposed the same, or substantially and materially the same or similar duties on, among others, the Individual Defendants, as those set forth above.

**Control, Access, and Authority**

71.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Disney, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Disney.

72.    Because of their advisory, executive, managerial, and directorial positions with Disney, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Disney.

73.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Disney and was at all times acting within the course

and scope of such agency.

### Reasonable and Prudent Supervision

74.     To discharge their duties, the officers and directors of Disney were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Disney were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how Disney conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that Disney was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

### BREACHES OF DUTIES

75.     Each Individual Defendant, by virtue of their position as a director and/or officer,

owed to Disney and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Disney, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Disney, the absence of good faith on their part, and a reckless disregard for their duties to Disney and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Disney.

76. The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

77. In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Related Securities Action that alleges violations of the federal securities laws. As a result, Disney has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

78. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

79. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In

furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

80.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, unjust enrichment, gross mismanagement, and abuse of control; and (b) disguise and misrepresent the Company's actual business and financial prospects.

81.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

82.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

**SUBSTANTIVE ALLEGATIONS**

**Background of the Company**

83.     The Walt Disney Company (originally known as Disney Brothers Cartoon Studio) was founded in 1923 by brothers Walt and Roy Disney. The Company began with the sale of Alice's Wonderland, a black-and-white silent film featuring a live-action girl who interacted with

animated characters. After making a series of these "Alice Comedies" the Company transitioned to an all-cartoon series based on a character named Oswald the Lucky Rabbit before ultimately launching another cartoon series based on its now iconic character Mickey Mouse.

84.     A century later, Disney stands as the world's largest entertainment group. The Company, together with its subsidiaries, engages in the film and episodic television content production and distribution business; operates television networks under the ABC, Disney, ESPN, Freeform, FX, Fox, National Geographic, and Star brands; and runs studios that produce films under the Walt Disney Pictures, 20th Century Studios, Marvel, Lucasfilm, Pixar, and Searchlight Pictures banners.

85.     Disney also offers DTC streaming services through Disney+, Disney+ Hotstar, ESPN+, Hulu, and Star+; sells and licenses film and television content to third-party television and subscription video-on-demand services; operates theatrical, home entertainment, and music distribution services; stages and licenses live entertainment events; and offers post-production services by Industrial Light & Magic and Skywalker Sound.

86.     In addition, the Company operates theme parks and resorts (such as Walt Disney World Resort in Florida, Disneyland Resort in California, Disneyland Paris, Hong Kong Disneyland Resort, and Shanghai Disney Resort), Disney Cruise Line, Disney Vacation Club, National Geographic Expeditions, Adventures by Disney, and Aulani, a Disney resort and spa in Hawaii.

87.     Further, Disney licenses its intellectual property to a third party who owns and operates the Tokyo Disney Resort; offers consumer products, including by the licensing of trade names, characters, visual, literary, and other IP for use on merchandise, published materials, and games; operates a direct-to-home satellite distribution platform; sells branded merchandise

through retail, online, and wholesale businesses; and develops and publishes books, comic books, and magazines.

88.     In February 2020, Disney announced that then-CEO Iger would be stepping down after a storied, 15-year career leading the Company. Iger assumed the role of Executive Chairman and was to direct the Company's creative endeavors, while leading the Board and providing the benefit of his experience, leadership, and guidance through the end of his contract on December 31, 2021.

89.     Iger reportedly handpicked Chapek, who had worked under Iger for more than a decade, as his successor. "With the successful launch of Disney's direct-to-consumer businesses and the integration of Twenty-First Century Fox well underway, I believe this is the optimal time to transition to a new CEO," Iger said at the time. "I have the utmost confidence in Bob and look forward to working closely with him over the next 22 months as he assumes this new role and delves deeper into Disney's multifaceted global businesses and operations, while I continue to focus on the Company's creative endeavors."

90.     Just one month after Chapek became CEO, the COVID-19 coronavirus spread rapidly around the globe – with the World Health Organization officially declaring it a pandemic in March 2020. In response, many countries enacted various forms of lockdowns restricting their citizens' movement and work in an effort to contain the spread of the virus.

91.     The pandemic and related lockdowns negatively impacted Disney's businesses, forcing the Company to shutter its theme parks, resorts, and cruise lines. Movie distribution, historically the Company's most lucrative distribution channel, was all but eliminated as were live sports, a key programming source for Disney's television networks. The economic impact on the Company was swift and severe. In May 2020, Disney announced the suspension of its dividend.

In August 2020, the Company reported its first quarterly loss in 19 years. And in November 2020, the Company reported its first annual loss in more than 40 years.

92.     While most of Disney's businesses suffered in the wake of the COVID-19 pandemic, subscriptions to the Company's new streaming service Disney+ rapidly took off. When Disney+ was launched in the United States in November 2019 (before Chapek took over) Disney set an initial target of 60 million to 90 million subscribers by the end of fiscal 2024.[7] After Chapek assumed leadership of the Company, however, the service experienced higher growth than originally anticipated, gaining over 50 million subscribers in its first five months online (by April 2020) and nearly 74 million subscribers in its first year (by November 2020). Thus, the success of Disney+ became virtually the only bright spot in an otherwise bleak start to Chapek's tenure as CEO.

93.     Against this backdrop, Chapek decided to 'go all in' on Disney's DTC streaming strategy, essentially staking his legacy on the success or failure of Disney+. To that end, in October 2020, Disney announced a major reorganization of the Company's media and entertainment operations. The new structure was reportedly designed to further accelerate the Company's focus on a DTC strategy, in light of the rapid success of Disney+. As defendant Chapek explained in an interview on CNBC, the reorganization was intended to "accelerate our transition to a real direct-to-consumer priority company." He continued: "We believe that we've got the opportunity to build upon the success of Disney+, which by almost any measure has been far and above anybody's expectations and really use this to catalyze our growth and increase shareholder wealth."

94.     Disney issued a press release that similarly characterized the pivot as being based on the success of Disney+, stating in relevant part as follows:

---

[7] Disney's fiscal year ends on the Saturday closest to September 30th of the calendar year.

*In light of the tremendous success achieved to date in the Company's direct-to-consumer business and to further accelerate its DTC strategy, The Walt Disney Company today announced a strategic reorganization of its media and entertainment businesses.* Under the new structure, Disney's world-class creative engines will focus on developing and producing original content for the Company's streaming services, as well as for legacy platforms, while distribution and commercialization activities will be centralized into a single, global Media and Entertainment Distribution organization. The new Media and Entertainment Distribution group will be responsible for all monetization of content – both distribution and ad sales – and will oversee operations of the Company's streaming services. It will also have sole P&L accountability for Disney's media and entertainment businesses.

95.     The reorganization represented a dramatic departure from Disney's historical reporting structure and was hugely controversial within the Company because it took power away from creative content-focused executives and centralized it in a new reporting group led by defendant Daniel who reported directly to defendant Chapek. Prior to the announcement, the Company was organized into four reporting segments: (i) Media Networks; (ii) Parks, Experiences and Products; (iii) Studio Entertainment; and (iv) Direct-to-Consumer & International. Chapek reorganized the Company into just two reporting segments: (i) DMED; and (ii) DPEP.

96.     Following the reorganization, the distribution and commercialization activities of the Company's media and entertainment operations were centralized into a single reporting segment, namely DMED. DMED's operating results were in turn reported across three distribution platforms/significant lines of business: (i) Direct-to Consumer (*i.e.*, streaming); (ii) Linear Networks (*i.e.*, cable and broadcast television networks); and (iii) Content Sales/Licensing (primarily comprising theatrical, home entertainment, and TV/SVOD distribution globally).

97.     Thus, DMED became responsible for the monetization of all Disney content globally – both distribution and advertising sales – and oversaw the operations of the Company's streaming services. With this new structure, Chapek removed budgetary and distribution control from the heads of Disney's content groups (much to their dismay) and placed control in the hands

of DMED's new Chairman, defendant Daniel, who reported directly to his long-time mentor Chapek. Daniel oversaw the profit and loss management, distribution, operations, sales, advertising, data, and technology functions for all of the Company's content worldwide. In this way, defendants Daniel and Chapek exerted near complete control over the Company's strategic decisions around content.

98.     Critically, DMED was responsible for determining which platform the Company's content would be released on, whether it be a streaming service, a television network, or traditional movie theaters. "There is a seismic shift happening in the marketplace, and you can either lead or follow and we chose to lead," Chapek said of the Company's push into streaming, adding that the focus is now on "what platform is best to meet those consumer needs."

99.     "Given the incredible success of Disney+ and our plans to accelerate our direct-to-consumer business, we are strategically positioning our Company to more effectively support our growth strategy and increase shareholder value," Chapek said at the time. Chapek further explained that:

> Managing content creation distinct from distribution will allow us to be more effective and nimble in making the content consumers want most, delivered in the way they prefer to consume it. Our creative teams will concentrate on what they do best – making world-class franchise-based content – while our newly centralized global distribution team will focus on delivering and monetizing that content in the most optimal way across all platforms, including Disney+, Hulu, ESPN+ and the coming Star International streaming service.

100.    During the Relevant Period, defendants repeatedly misled investors about the success of the Disney+ platform by concealing the true costs of the platform, concealing the expense and difficulty of maintaining robust Disney+ subscriber growth, and claiming that the platform was on track to achieve profitability and 230-260 million paid global subscribers by the end of fiscal year 2024.

101.    Defendants made these representations notwithstanding the fact that initial subscriber numbers for Disney+ had been boosted temporarily and unsustainably by a low launch price of $6.99 per month, a bevy of additional short-term, low-cost promotions, and a near-captive audience of consumers who were homebound due to COVID-19 restrictions. As a result, the consumers most likely to subscribe to Disney+ had already done so by the start of the Relevant Period. Furthermore, Disney was suffering staggering costs in creating the content needed to attract such a large number of subscribers in the highly competitive streaming wars that were then raging among Disney's many competitors such as Netflix, Apple TV+, Amazon Prime, Paramount+, HBO Max, YouTube, and Peacock. In truth, during the Relevant Period, Disney+ was never on track to achieve the 2024 profitability and subscriber figures provided to investors and such estimates lacked a reasonable basis in fact.

102.    To conceal these adverse facts, defendants engaged in a fraudulent scheme designed to hide the extent of Disney+ losses and to make the growth trajectory of Disney+ subscribers appear sustainable and 2024 Disney+ targets appear achievable when they were not. Specifically, defendants used the newly created DMED to inappropriately shift costs out of the Disney+ platform and onto legacy platforms. DMED, under the direction of Chapek and Daniel and with the knowledge of McCarthy, debuted content created for Disney+ initially on a legacy platform in order to shift marketing and production costs onto that platform. Under the newly reorganized Company, the initial costs of marketing campaigns were generally recognized in the DMED distribution platform of initial exploitation, with allocation of programming and production costs driven by distribution of the relevant content across windows. As part of a scheme to make Disney+'s financial performance appear more successful than it was, defendants aired certain shows that were supposed to be Disney+ originals – such as the mystery show The

Mysterious Benedict Society and the medical drama Doogie Kameāloha, M.D. – first on legacy television networks such as the Disney Channel. By doing so, a significant portion of the marketing and production costs of the shows were shifted away from Disney+ and on to the legacy platforms. Despite this cost-shifting scheme, defendants repeatedly represented during the Relevant Period that platform distribution decisions were made based on different reasons, such as customer preferences and what was best for the business commercially.

103.    Defendants implemented this scheme almost from the beginning of the October 2020 reorganization, indicating the intent to shift costs in this manner was a motivating factor behind the reorganization. For example, The Mysterious Benedict Society was cast in early 2020 and began production in November 2020, only one month after Disney announced the creation of DMED and one month before the 2020 Investor Day which starts the Relevant Period.

**Materially False and Misleading Statements Issued During the Relevant Period**

104.    The Relevant Period begins on December 10, 2020. On that date, Disney broadcasted the Company's 2020 Investor Day presentation from its Burbank headquarters. The presentation was designed to update investors about the Company's businesses, reorganization, and plans, particularly those concerning the Company's DTC strategies. All of the Individual Defendants delivered prepared remarks; and defendants Chapek and McCarthy also answered questions from analysts. Shortly after the conclusion of the presentation, Disney made a replay of the event available and posted downloadable slides that accompanied the presentation on the Company's website.

105.    Defendant Chapek boasted at the outset of his 2020 Investor Day presentation that the Company had already met its original Disney+ subscriber estimate, stating in relevant part as follows:

Disney+ has exceeded our wildest expectations with 86.8 million subscribers as of December 2. That's quite an achievement. This success has bolstered our confidence in our continued acceleration towards a DTC-first business model. And more importantly, it's launched The Walt Disney Company into a new era of delivering consumers truly exceptional entertainment build around our world-renowned brands and franchises.

106.   Defendant Chapek then discussed how the Company's new distribution and commercialization team (DMED) would distribute Disney's content on the platform most beneficial to consumers, stating in pertinent part as follows:

Our unique access to an incredible number of consumer touch points across our businesses gives us a clear advantage. Based on insights gained from this wealth of data, our distribution and commercialization team is able to better inform our creatives of consumer preferences. And the creative teams are empowered to make the high-quality branded entertainment they believe will resonate with audiences. This new organization also gives us maximum flexibility in determining when and on which platform content will be available. And this is especially important now given consumers' rapidly changing consumption behaviors and the prolonged uncertainty due to the pandemic.

*As circumstances change, we will continue to consider these and other critical factors when determining what steps we may take to most effectively distribute our programming. Our goal is always to serve consumers in the best way possible.*

107.   During defendant Daniel's presentation, he emphasized that the Company would distribute Disney's content on the platform most beneficial to consumers, stating in relevant part as follows:

As a company, we were set up to achieve success in an increasingly dynamic environment. *And as Bob mentioned, consumer behavior really does drive our decision-making. While we have always valued the data gained through our numerous consumer touch points, the rapid growth of our portfolio of D2C services provides us with an even greater opportunity to understand their preferences. And we are using these insights to help determine how to optimally engage with our audiences. In fact, our team uses all of the information available to us when determining how best to allocate our creative content budgets across all platforms, with the goal to maximize both audience engagement and commercial impact.* And we share this budgetary framework and critical insights with our creative partners as part of a truly collaborative planning process that delivers high-quality branded entertainment to achieve our established growth objectives for all of our platforms, from direct-to-consumer to linear networks to

theatrical exhibition.

This exchange of information is a key pillar to our organization's overall strategy, which also relies on the increased flexibility provided by our mix of distribution options, including, in no particular order, releasing content though traditional windows, such as theaters and linear networks before it is made available on our direct-to-consumer services, particularly recognizing the actual exhibition's ability to help establish major franchises that are at the heart of our Disney flywheel; providing our accretive output simultaneously, day and date on both traditional and D2C platforms, in concert with our premier access commercialization strategy for the D2C component; and exclusively distributing our content on our streaming services, providing a constant flow of new titles for subscriber acquisition and to minimize churn. Of course, regardless of where it originates, all of our films and episodic series will inevitably end up as part of our incredibly rich and increasingly robust library of content on our D2C platforms.

***Since streaming has quickly become a preferred method of consumption, we are prioritizing our D2C platforms, both in terms of how we distribute our content and also through an increased investment in our original programming for Disney+, Hulu, ESPN+ and the upcoming Star-branded international general entertainment offering.***

\*       \*       \*

***One of the primary benefits of our new organizational structure is our ability to quickly reevaluate and adjust our plans in light of changes in the marketplace, and we will continue to shift and optimize our mix of window theatrical, day-and-date and D2C exclusive offerings according to what is best for the consumer and our business.***

108.   During defendant McCarthy's presentation, she provided profitability and subscriber estimates for Disney+ (and related foreign streaming services such as Disney+ Hotstar[8]), stating in pertinent part as follows:

***Today, I'm going to provide guidance across our services for fiscal 2024 to be consistent with the time frame we guided to at our last Investor Day.*** Let me start with Disney+ which, as you heard earlier today, had 86.8 million total paid subscribers as of December 2, approximately 30% of which were Disney+ Hotstar subscribers.

---

[8] Disney+ Hotstar is an Indian subscription video on demand streaming service owned by Disney that operates in India. Disney+ Hotstar was created after Disney's 2019 acquisition of 21st Century Fox, Star India's parent company. Star India had launched Hotstar in 2015 but it was ultimately integrated with Disney's global streaming brand Disney+ as Disney+ Hotstar in April 2020.

\*        \*        \*

If you recall, last year, we said that we expected Disney+ to have between 60 million and 90 million subscribers by the end of fiscal 2024. But as you know, our subscriber growth to date is well ahead of our original expectations. And we have an incredible and growing slate of high-quality content that will capture a broader global audience and further fuel Disney+, making it what we believe is an even more compelling product.

These factors, along with the addition of our Star general entertainment offering in various markets and the growth of Disney+ Hotstar, give us an even greater optimism about our future. And they enable us to significantly increase our subscriber guidance. ***We now expect that by the end of fiscal 2024, we will have between 230 million and 260 million total paid Disney+ subscribers globally compared to the 60 million to 90 million we shared last year. I'll note that our prior outlook did not anticipate the launch of Disney+ Hotstar, which we now expect could be between 30% and 40% of our subscriber base by the end of fiscal 2024.***

\*        \*        \*

Given the value of growing our subscriber base, as you've seen today, we plan to reinvest revenue generated from our better-than-expected subscriber growth back into content investment. ***Thus we continue to expect Disney+ to achieve profitability in fiscal 2024. Again, I'll note that this guidance includes Disney+, Star, Star+ and Disney+ Hotstar.***

109.    The slides that accompanied the 2020 Investor Day presentations reiterated the Company's estimate that, by the end of fiscal year 2024, Disney+ would be profitable and would have between 230-260 million paid global subscribers (30%-40% of which would be from Disney+ Hotstar). These new estimates represented an astounding ***three-fold increase*** from prior estimates ***without any degradation in expected profitability*** for the segment.

110.    During the 2020 Investor Day's Q&A session, in response to a question from a Morgan Stanley analyst, defendant Chapek explained the decision-making process that went into determining when and on which platform or platforms Disney's content would be distributed, stating in relevant part as follows:

So to me, it's really about over – of the 100 titles that we announced today, 80% of them are going first to Disney+, which I think says something about our pivot over to Disney+. But at the same time, we had $13 billion of box office last year. And that's obviously not something to sneeze at. And we know as The Walt Disney Company who've got this plethora of franchises that we just showed you today, that we build those franchises through the theatrical exhibition window and we did $13 billion back in '19. ***So for us, it's about balance. And it's about following the consumer as they make that transition.***

***And so part of why we did the reorganization that we did is to ensure that we've got an organization that's flexible to read all the cues, whether it's the cessation of COVID or it's changing consumer behavior so that we can very nimbly make decisions as we go forward.*** And that 80% direct-to-consumer is not just Disney+, obviously, but that includes Hulu and Star as well.

111.    Following the 2020 Investor Day, analyst reports heralded the remarkable claims of rapid and profitable Disney+ growth. For example, a Barclays analyst report proclaimed that "DTC guidance blows past consensus expectations"; a Wolfe Research report trumpeted "Expectations Blown Away"; a Morgan Stanley report cheered "To Infinity & Beyond"; and an RBC Capital Market Reports figuratively burst into song: "Disney, Disney, Disney, Can't You See? Sometimes Your Words Just Hypnotize Me." Some analysts even predicted that Disney+ might surpass Netflix as the most widely adopted paid streaming service in the world. Defendants' representations had their intended effect, pushing the price of Disney common stock to all-time highs of over $180 per share by the end of December 2020.

112.    On January 19, 2021, the Company filed its annual proxy statement on form DEF-14A with the SEC (the "2021 Proxy"). Defendants Defendants Chapek, Arnold, Barra, Catz, deSouza, Froman, Iger, Lagomasino, Parker, and Rice solicited the 2021 Proxy.

113.    Regarding the Board's role in risk oversight at the Company, the 2021 Proxy stated:

As noted in the Company's Corporate Governance Guidelines, the Board, acting directly or through committees, is responsible for "assessing major risk factors relating to the Company and its performance" and "reviewing measures to address and mitigate such risks." In discharging this responsibility, the Board, either directly or through committees, assesses both (a) ***risks that relate to the key***

34

*economic and market assumptions that inform the Company's business plans (including significant transactions) and growth strategies*, and (b) significant operational risks related to the conduct of the Company's day-to-day operations.

Risks relating to the market and economic assumptions that inform the Company's business plans and growth strategies are specifically addressed with respect to each business unit in connection with the Board's review of the Company's long-range plan. The Board also has the opportunity to address such risks at each Board meeting in connection with its regular review of significant business and financial developments. The Board reviews risks arising out of specific significant transactions when these transactions are presented to the Board for review or approval.

*Significant operational risks that relate to on-going business operations are the subject of regularly scheduled reports to either the full Board or one of its committees*. The Board acting through the Audit Committee reviews as appropriate whether these reports cover the significant risks that the Company may then be facing.

*Each of the Board's committees addresses risks that fall within the committee's areas of responsibility*. For example, the Audit Committee periodically reviews the audit plan of the internal audit department, the international labor standards compliance program, the tax function, treasury operations, insurance and the Company's standards of business conduct compliance program. In addition, the Audit Committee receives regular reports from: corporate controllership and the outside auditor on financial reporting matters; the internal audit department about significant findings; and the General Counsel regarding legal and regulatory risks.

(Emphasis added.)

114.   Further, the 2021 Proxy represented that "[t]he Company has Standa*rds of Business Conduct*, which are applicable to all employees of the Company, including the principal executive officer [and] the principal financial officer…" It further stated that "[t]he Board has a separate *Code of Business Conduct and Ethics for Directors*, which contains provisions specifically applicable to Directors."

115.   These statements in the 2021 Proxy were false and misleading, because the 2021 Proxy failed to disclose that: (i) contrary to the 2021 Proxy's descriptions of the Board's and its committees' oversight functions, the Board and its committees were not adequately exercising

these functions and were causing or permitting the Company to issue false and misleading statements about it; and (2) the Individual Defendants violated the codes of conduct.

116.    Furthermore, the 2021 Proxy was false and misleading because it failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by Defendants as follows:

> (a) that Disney+ was suffering decelerating subscriber growth, losses, and cost overruns;
>
> (b) that the true costs incurred in connection with Disney+ had been concealed by Disney executives by debuting certain content intended for Disney+ initially on Disney's legacy distribution channels and then making the shows available on Disney+ thereafter in order to improperly shift costs out of the Disney+ segment;
>
> (c) that DMED had made platform distribution decisions based not on consumer preference, consumer behavior, or the desire to maximize the size of the audience for the content as represented, but based on the desire to hide the full costs of building Disney+'s content library;
>
> (d) that the Company was not on track to achieve its 2024 Disney+ paid global subscriber and profitability targets, that such targets were not achievable, and that such estimates lacked a reasonable basis in fact; and
>
> (e) that, as a result of (a)-(d) above, defendants had materially misrepresented the actual performance of Disney+, the sustainability of Disney+'s historical growth trends, the profitability of Disney+, and the likelihood that Disney could achieve its 2024 Disney+ subscriber and profitability targets.

117.    During the Relevant Period, defendants repeatedly reiterated the fiscal year 2024 profitability and global subscriber estimates for Disney+. For instance, on the Company's February 11, 2021 earnings call for its first fiscal quarter of 2021, defendant McCarthy confirmed that Disney+ was expected to reach profitability in fiscal 2024, stating in pertinent part as follows:

> Okay. Thanks, Brett. You're absolutely right. Peak losses, we expect in this fiscal year. *We said at our Investor Day, which wasn't too long ago, that we expected to reach profitability in fiscal 2024. We're not going to change that at this point*, although we are very pleased with the results that we just announced. But we are also, given the value of growing our sub base, we are continuing to invest in high-

quality content. We believe that content is the single biggest driver to not only acquiring subs, but retaining them.

118.    On the Company's May 13, 2021 earnings call for its second fiscal quarter of 2021, defendant Chapek reiterated that Disney was on track to achieve its Disney+ 2024 paid global subscriber estimate, stating in relevant part as follows:

> We are uniquely positioned with the most compelling brands and franchises in entertainment, and we continue to deliver the high-quality, one-of-a-kind content that consumers want. That's clearly reflected in the success of Disney+ which amassed nearly 104 million paid subscribers as of the end of the second fiscal quarter. ***We are on track to achieve our guidance of 230 million to 260 million subscribers by the end of fiscal 2024.***

119.    During the same call, defendant McCarthy likewise stated: "***As Bob mentioned earlier, we remain right on track to reach our fiscal 2024 guidance of 230 million to 260 million subs***, powered by the addition of 30 million paid Disney+ subs in the first half of the year."

120.    The statements referenced above were materially false and misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by defendants as follows:

(a) that Disney+ was suffering decelerating subscriber growth, losses, and cost overruns;

(b) that the true costs incurred in connection with Disney+ had been concealed by Disney executives by debuting certain content intended for Disney+ initially on Disney's legacy distribution channels and then making the shows available on Disney+ thereafter in order to improperly shift costs out of the Disney+ segment;

(c) that DMED had made platform distribution decisions based not on consumer preference, consumer behavior, or the desire to maximize the size of the audience for the content as represented, but based on the desire to hide the full costs of building Disney+'s content library;

(d) that the Company was not on track to achieve its 2024 Disney+ paid global subscriber and profitability targets, that such targets were not achievable,

and that such estimates lacked a reasonable basis in fact; and

(e) that, as a result of (a)-(d) above, defendants had materially misrepresented the actual performance of Disney+, the sustainability of Disney+'s historical growth trends, the profitability of Disney+, and the likelihood that Disney could achieve its 2024 Disney+ subscriber and profitability targets.

121.     On September 21, 2021, the Company and defendant Chapek gave a virtual presentation at the Goldman Sachs Communacopia Conference. During the presentation, Chapek acknowledged that Disney+ subscriber growth had slowed in the fourth quarter of the fiscal year ended October 2, 2021: "*In Q4, I think what you can expect to see is that our global paid subs will increase by low single-digit millions of subscribers versus Q3*."

122.     This new information concerning the number of global paid Disney+ subscribers failed to meet the market's expectations. Prior to the market's close that day, CNBC reported the disappointing news in pertinent part as follows:

Disney's CEO Bob Chapek said Tuesday his company's streaming service growth has "hit some headwinds" related to coronavirus, causing shares to close lower for the day.

Disney expects to add "low single-digit millions" of streaming subscribers in the fourth quarter, Chapek said. Disney shares ended the session down 4.1% after Chapek's comments at the virtual Goldman Sachs Communacopia Conference.

Chapek said "mobilizing partners" in Latin America to push Disney's new Star+ streaming service, the Covid-related suspension of the India Premier League – whose games air on Disney's Hotstar – and production delays from the delta variant have all hurt subscriber numbers in the fourth quarter.

"We are going to see a little bit more noise than maybe the Street projects quarter to quarter," Chapek said. "The resurgence of Covid and delta did impact some of our productions."

Chapek's forecast is significantly lower than some analyst estimates. Deutsche Bank analyst Bryan Kraft had projected Disney+ net adds of about 13 million in the quarter.

Global production delays will be "very short term," Chapek said. But he acknowledged there won't be as much new programming in the fourth quarter "than

we might have expected," which will affect subscriber growth.

Disney has projected 230 million to 260 million Disney+ subscribers by 2024. Disney said in August it had 116 million Disney+ subscribers.

Chapek cautioned investors that quarter-to-quarter growth "is not linear" and some choppiness is expected. Still, he remained confident in Disney's long-term growth outlook.

123.    In response to the news, the price of Disney common stock closed down $7.44 per share, or more than 4%, from the prior day's close of $178.61 on September 20, 2021 on abnormally high volume of over 23 million shares traded. Despite these revelations, the price of Disney common stock remained artificially inflated because defendants failed to disclose the full truth. In addition, defendants continued to make materially false and misleading statements which continued to artificially inflate the price of Disney common stock. For example, during the September 21, 2021 presentation, defendant Chapek stated: "***We're very confident about our long-term sub growth as we have been***."

124.    After the market closed on November 10, 2021, Disney issued a press release, which was also filed with the SEC that day as an exhibit to a Form 8-K, reporting the Company's financial results for its fourth quarter and fiscal year ended October 2, 2021. Disney posted quarterly results that missed Wall Street's already diminished expectations as the Company saw a dramatic slowdown in Disney+ subscribers. The Company added just 2.1 million customers during the quarter (the smallest quarterly gain since the service's launch two years prior), revenue of $18.53 billion, and adjusted earnings per share of 37 cents – all of which were below consensus estimates of 119.6 million subscribers, $18.78 billion in revenues, and adjusted earnings per share of 49 cents, as compiled by *Bloomberg*.

125.    In response to this news, the price of Disney common stock closed down $12.34 per share, or more than 7%, on November 11, 2021 on abnormally high volume of over 62 million

shares traded. Despite these revelations, the price of Disney common stock remained artificially inflated because defendants failed to disclose the full truth. In addition, defendants continued to make materially false and misleading statements which continued to artificially inflate the price of Disney common stock as detailed below.

126.    On the Company's earnings call after the market closed on November 10, 2021, defendant Chapek doubled-down on the Company's prior forecast that the streaming service would reach profitability and have between 230 million and 260 million paid global Disney+ subscribers by the end of fiscal 2024, stating in pertinent part as follows:

> I want to reiterate that we remain focused on managing our DTC business for the long term, not quarter-to-quarter, and *we're confident we are on the right trajectory to achieve the guidance that we provided at last year's Investor Day, reaching between 230 million and 260 million paid Disney+ subscribers globally by the end of fiscal year 2024, and with Disney+ achieving profitability that same year*.

127.    Defendant McCarthy also reiterated the Company's prior subscriber growth and profitability forecast, stating in pertinent part as follows:

> As Bob mentioned, we are increasing our overall long-term content expense for Disney+, and *we are well positioned to achieve the subscriber target of 230 million to 260 million by fiscal 2024 that we laid out at last year's Investor's Day. And we also remain confident in our expectation that Disney+ will achieve profitability in fiscal 2024*.

128.    On January 19, 2022, the Company filed its annual proxy statement on form DEF-14A with the SEC (the "2022 Proxy"). Defendants Chapek, Arnold, Barra, Catz, Chang, deSouza, Froman, Lagomasino, McDonald, Parker, and Rice solicited the 2022 Proxy.

129.    Regarding the Board's role in risk oversight at the Company, the 2022 Proxy stated:

> As noted in the Company's Corporate Governance Guidelines, the *Board, acting directly or through committees, is responsible for "assessing major risk factors relating to the Company and its performance" and "reviewing measures to address and mitigate such risks."* In discharging this responsibility, the Board, either directly or through committees, assesses both (a) risks that relate to the key

economic and market assumptions that inform the Company's business plans (including significant transactions) and growth strategies, and (b) significant operational risks related to the conduct of the Company's day-to-day operations.

***Risks relating to the market and economic assumptions that inform the Company's business plans and growth strategies are specifically addressed with respect to each business unit in connection with the Board's review of the Company's long-range plan***. The Board also has the opportunity to address such risks at each Board meeting in connection with its regular review of significant business and financial developments. The Board reviews risks arising out of specific significant transactions when these transactions are presented to the Board for review or approval.

Significant operational risks that relate to on-going business operations are the subject of regularly scheduled reports to either the full Board or one of its committees. The Board acting through the Audit Committee reviews as appropriate whether these reports cover the significant risks that the Company may then be facing.

***Each of the Board's committees addresses risks that fall within the committee's areas of responsibility***. For example, the Audit Committee periodically reviews the audit plan of the internal audit department, the international labor standards compliance program, the tax function, treasury operations, insurance and the Company's standards of business conduct compliance program. In addition, the Audit Committee receives regular reports from: corporate controllership and the outside auditor on financial reporting matters; the internal audit department about significant findings; and the General Counsel regarding legal and regulatory risks. . .

The Audit Committee reserves time at each meeting for private sessions with the Chief Financial Officer, General Counsel, head of the internal audit department and outside auditors. The Compensation Committee addresses risks arising out of the Company's executive compensation programs as described at page 29. The operational risks periodically reviewed by committees are also reviewed by the entire Board when a committee or the Board determines this is appropriate.

The independent Lead Director promotes effective communication and consideration of matters presenting significant risks to the Company through her role in developing the Board's meeting agendas, advising committee chairs, chairing meetings of the independent Directors and facilitating communications between independent Directors and the Chief Executive Officer.

(Emphasis added.)

130.    Further, the 2022 Proxy represented that "[t]he Company has *Standards of Business*

*Conduct*, which are applicable to all employees of the Company, including the principal executive officer [and] the principal financial officer…" It further stated that "[t]he Board has a separate *Code of Business Conduct and Ethics for Directors*, which contains provisions specifically applicable to Directors."

131.    These statements in the 2022 Proxy were false and misleading, because the 2022 Proxy failed to disclose that: (i) contrary to the 2022 Proxy's descriptions of the Board's and its committees' oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements about it; and (2) the Individual Defendants violated the codes of conduct.

132.    Furthermore, the 2022 Proxy was false and misleading because it failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by Defendants as follows:

> (a) that Disney+ was suffering decelerating subscriber growth, losses, and cost overruns;
>
> (b) that the true costs incurred in connection with Disney+ had been concealed by Disney executives by debuting certain content intended for Disney+ initially on Disney's legacy distribution channels and then making the shows available on Disney+ thereafter in order to improperly shift costs out of the Disney+ segment;
>
> (c) that DMED had made platform distribution decisions based not on consumer preference, consumer behavior, or the desire to maximize the size of the audience for the content as represented, but based on the desire to hide the full costs of building Disney+'s content library;
>
> (d) that the Company was not on track to achieve its 2024 Disney+ paid global subscriber and profitability targets, that such targets were not achievable, and that such estimates lacked a reasonable basis in fact; and
>
> (e) that, as a result of (a)-(d) above, defendants had materially misrepresented the actual performance of Disney+, the sustainability of Disney+'s historical growth trends, the profitability of Disney+, and the likelihood that Disney could achieve its 2024 Disney+ subscriber and profitability targets.

133.    On August 10, 2022, Disney issued a press release, which was also filed with the SEC as an exhibit to a Form 8-K, reporting the Company's results for the third fiscal quarter of 2022 ended July 2, 2022. Disney also held an earnings call to discuss its results at that time. During the call, defendant McCarthy lowered the Company's 2024 guidance for Disney+ by *only 15 million* on both the low end and high end – still far above the actual performance of the platform – and reaffirmed the 2024 profitability estimate, stating in relevant part as follows:

> *Finally, before we move to Q&A, I want to spend some time sharing a few updates on our fiscal 2024 guidance for Disney+. We are providing more detail on subscriber targets by separating our guidance into 2 categories: core Disney+ and Disney+ Hotstar. Excluding the impact of any significant future macro headwinds, our core Disney+ subscriber target range is 135 million to 165 million by the end of fiscal 2024, largely consistent with previously provided guidance that non-Hotstar Disney+ subscribers in 2024 would approximate 60% to 70% of the expected 230 million to 260 million total subscriber base.*
>
> *We are, however, updating subscriber guidance for Disney+ Hotstar to up to 80 million subscribers by the end of fiscal 2024.* We intend to refine this target over time as subscriber visibility in India will be clearer once the ICC and BCCI cricket rights sales processes are completed. As you may know, we recently made the disciplined decision to not proceed with the Indian Premier League digital rights, and we'll evaluate these rights with that same discipline.
>
> *As we sit here today, we remain confident that Disney+ will achieve profitability in fiscal 2024* and look forward to several upcoming catalysts, including reaching a steady state of tentpole original content releases, delivery of premium general entertainment and international local originals and the upcoming launch of our ad-supported tier, alongside the new pricing structure announced earlier today.

134.    The statements referenced above were materially false and misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by defendants as follows:

> (a) that Disney+ was suffering decelerating subscriber growth, losses, and cost overruns;

(b) that the true costs incurred in connection with Disney+ had been concealed by Disney executives by debuting certain content intended for Disney+ initially on Disney's legacy distribution channels and then making the shows available on Disney+ thereafter in order to improperly shift costs out of the Disney+ segment;

(c) that DMED had made platform distribution decisions based not on consumer preference, consumer behavior, or the desire to maximize the size of the audience for the content as represented, but based on the desire to hide the full costs of building Disney+'s content library;

(d) that the Company was not on track to achieve even the reduced 2024 Disney+ paid global subscriber and profitability targets, that such targets were not achievable, and that such estimates lacked a reasonable basis in fact; and

(e) that, as a result of (a)-(d) above, defendants had materially misrepresented the actual performance of Disney+, the sustainability of Disney+'s historical growth trends, the profitability of Disney+, and the likelihood that Disney could achieve its 2024 Disney+ subscriber and profitability targets.

### The Truth Emerges

135.   On November 8, 2022, Disney issued a press release reporting the Company's financial results for its fourth quarter and fiscal year ended October 1, 2022. Disney missed analyst estimates by wide margins on both the top and bottom lines. Revenue in the quarter grew just 9% to $20.15 billion, below estimates at $21.36 billion. Sales, at $20.2 billion, fell about $1 billion short of analysts' projections. Earnings, excluding certain items, fell to 30 cents share, missing the average estimate of 51 cents from analysts surveyed by Bloomberg. The Company's DTC segment, which includes streaming services Disney+, ESPN+, Hulu, and Hotstar, reported a monumental operating loss of *$1.47 billion* compared to a $630 million loss in the same quarter the year prior. Revenue in the segment increased just 8% to $4.9 billion. The Company also reported a decline in its average revenue per Disney+ subscriber, as more customers subscribed through a discounted bundle with the Company's other services. Notably, the bundled offering made up about 40% of domestic subscribers, confirming that Disney was relying on short-term

promotional efforts to boost subscriber growth while impairing the platform's long-term profitability.

136.    In response to this news, the price of Disney common stock collapsed $13.15 per share, or more than 13%, in a single day on November 9, 2022 on abnormally high volume of over 62 million shares traded.

137.    Less than two weeks later, and only five months after the Board voted to extend Chapek's employment contract, the Company announced on November 20, 2022 that the Board had terminated Chapek and replaced him with Iger. Defendant Daniel was let go within 24 hours thereafter.

138.    On November 21, 2022, *The Wall Street Journal* reported on some of the behind-the-scenes disputes and issues that ultimately led to Chapek's dismissal, whose position at the Company had reportedly "been shaky for months." Significantly, the report also included information concerning a previously undisclosed cost-shifting scheme employed by defendants to hide certain expenses that should have been attributed to Disney+ so that the streaming service would appear closer to profitability than in fact was the case. Not only did the Individual Defendants know about this strategy and intentionally employ it to deceive investors, but reportedly defendant McCarthy had internally expressed her concerns about its propriety. The report stated in pertinent part as follows:

> Disney is moving some shows that were supposed to be Disney+ originals and air them first on other networks including the Disney Channel, people familiar with the matter said. By doing so, the costs of production and marketing of the shows – which included mystery show "The Mysterious Benedict Society" and medical drama "Doogie Kameāloha, M.D." – would be shifted away from the streaming service, making its financial performance look better, they said.

> Ms. McCarthy was concerned about this strategy, the people said.

139.    Other news outlets thereafter similarly reported that "Disney Discovered Bob

45

Chapek Was 'Cooking the Books' to Hide Massive Losses in Revenue," and that "Bob Chapek Shifted Budgets to Disguise Disney+'s Massive Monetary Losses."

140.    On February 8, 2023, the Company reported financial results for its first quarter fiscal year 2023, ended December 31, 2022. Disney reported that *Disney+ lost 2.4 million subscribers* and the DTC business reported an increase in operating loss from $0.5 billion to $1.1 billion due in part to a higher loss at Disney+ which reflected higher programming and production costs.

141.    On a conference call that same day to discuss the results, Iger announced a broad restructuring of the Company aimed at putting the Company's streaming business on a path to both profitability and growth, stating in relevant part as follows:

> In 2019, Disney+ launched, with nearly 500 films and 7,500 episodes of television from across the world of Disney. Three years later, its meteoric rise is considered one of the most successful results in the history of the media business.
>
> Now it's time for another transformation, one that rationalizes our enviable streaming business and puts it on a path to sustained growth and profitability while also reducing expenses to improve margins and returns and better positioning us to weather future disruption, increased competition and global economic challenges. We must also return creativity to the center of the company, increase accountability, improve results and ensure the quality of our content and experiences.

142.    Iger made clear that an important component of restoring the Company's success was returning power to the Company's creative executives, including distribution decisions, which Chapek had taken away as part of his October 2020 restructuring, stating in relevant part as follows:

> Now the details. Our company is fueled by storytelling and creativity. And virtually every dollar we earn, every transaction, every interaction with our consumers emanates from something creative. I've always believed that the best way to spur great creativity is to make sure that people who are managing the creative process feel empowered.
>
> Therefore, our new structure is aimed at returning greater authority to our creative

leaders and making them accountable for how their content performs financially. Our former structure severed that link, and it must be restored. Moving forward, our creative teams will determine what content we're making, how it is distributed and monetized and how it gets marketed.

143.    Iger additionally announced that the Company would be reorganized into three core business segments from which creative executives would purportedly be able to maximize revenue and growth, stating in pertinent part as follows:

Managing costs, maximizing revenue and driving growth from the content being produced will be their responsibility. Under our strategic reorganization, there will be 3 core business segments: Disney Entertainment, ESPN and Disney Parks, Experiences and Products.

Alan Bergman and Dana Walden will be Co-Chairman of Disney Entertainment, which will include the company's full portfolio of entertainment, media and content businesses globally, including streaming. Jimmy Pitaro will continue to serve as Chairman of ESPN, which will include ESPN Networks, ESPN+ and our international sports channels. And Josh D'Amaro will continue to be Chairman of Disney Parks, Experiences and Products, which will include our theme parks, resort destinations and cruise line as well as Disney's consumer products, games and publishing businesses.

These organizational changes will be implemented immediately, and we will begin reporting under the new business structure by the end of the fiscal year. This reorganization will result in a more cost-effective, coordinated and streamlined approach to our operations. And we are committed to running our businesses more efficiently, especially in a challenging economic environment.

144.    Iger also provided important details regarding the Company's efforts to rein in costs, indicating that Disney would be cutting $5.5 billion in costs with $2.5 billion in non-content cuts (including 7,000 jobs) and $3 billion in content savings over the next few years, stating in relevant part as follows:

In that regard, we are targeting $5.5 billion of cost savings across the company. First, reductions to our non-content costs will total roughly $2.5 billion, not adjusted for inflation. $1 billion in savings is already underway, and Christine will provide more details. But in general, the savings will come from reductions in SG&A and other operating costs across the company.

To help achieve this, we will be reducing our workforce by approximately 7,000

jobs. While this is necessary to address the challenges we're facing today, I do not make this decision lightly. I have enormous respect and appreciation for the talent and dedication of our employees worldwide, and I'm mindful of the personal impact of these changes.

On the content side, we expect to deliver approximately $3 billion in savings over the next few years, excluding sports. Christine will be providing more details during the call. Turning to our streaming businesses. I'm proud of what we've been able to achieve since the launch of Disney+ just 3 years ago. We are delivering more content with greater quality in more ways, in more places and to larger audiences.

145.    Additionally, Iger stated that the Company would no longer be providing long-term subscriber guidance for Disney+, stating in relevant part as follows:

Like many of our peers, we will no longer be providing long-term subscriber guidance in order to move beyond an emphasis on short-term quarterly metrics, although we will provide color on relevant drivers. Instead, our priority is the enduring growth and profitability of our streaming business.

146.    Then, on May 10, 2023, the Company reported financial results for its second quarter fiscal year 2023, ended April 1, 2023. Disney reported that Disney+ had lost subscribers for the second quarter in a row, further confirming that the 2024 Disney+ targets had never been achievable. During the quarter Disney+ had lost *4 million paid subscribers* from the prior quarter, which shocked analysts who had expected the service to *add* 1.7 million subscribers. Streaming revenue increased 12% from a year earlier in part due to recent price hikes necessitated by the streaming service's horrendous losses. On a conference call that same day to discuss the results, Iger again acknowledged that Disney's streaming business needed to rebalance its streaming business model in order to have a chance to reach profitability, stating that "it's critical we rationalize the volume of content we're creating and what we're spending to produce our content." He further announced that Disney was planning another price increase, at least for the Disney+ ad-free tier, risking even further subscriber losses.

147.    In response to this news, the price of Disney common stock declined $8.83 per

share, or more than 8% in a single day on May 11, 2023 on abnormally high volume of over 57 million shares traded.

148.    As a result of Defendants' wrongful acts and omissions, and the precipitous declines in the market value of the Company's securities, the Company and its shareholders have been damaged.

## DEFENDANTS' INSIDER TRADING

149.    Certain of the Individual Defendants capitalized on the artificially inflated stock price by selling significant portions of their holdings of Company common stock. While in possession of material, adverse, non-public information, Defendants Chapek and McCarthy (the "Insider Selling Defendants") collectively sold tens of thousands of shares of Disney stock for proceeds of nearly $14.81 million. These sales made by the Insider Selling Defendants during the Relevant Period were suspiciously large in quantity and timing and were inconsistent with their pre- and post-Relevant Period trading practices.

150.    Defendant Chapek sold 10,587 shares of his personally held Disney stock for proceeds of $1,926,834 between August 2021 and September 2021.

151.    Defendant McCarthy sold 79,481 shares of her personally held Disney stock for proceeds of $12,913,773 between January 2021 and February 2021.

## DAMAGES TO THE COMPANY

152.    Disney has been, and will continue to be, severely damaged and injured by the Defendants' misconduct.  As a direct and proximate result of the Defendants' conduct, Disney has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

> a.    costs incurred in compensation and benefits paid to Defendants that breached their fiduciary duties and violated federal securities laws;

     b.     substantial loss of market capital;

     c.     costs already incurred and to be incurred defending the Related Securities Action and;

     d.     any fines or other liability resulting from the Company's violations of federal law.

153.    In addition, Disney's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired.  The credibility and motives of management are now in serious doubt.

154.    The wrongdoing complained of herein has irreparably damaged Disney's corporate image and goodwill.  For at least the foreseeable future, Disney will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Disney's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

155.    Plaintiff brings this action derivatively in the right and for the benefit of Disney to redress injuries suffered, and to be suffered, by Disney as a direct result of violations of federal securities laws by the Defendants.  Disney is named as a Nominal Defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

156.    The Board of Disney, at the time this action was commenced, consisted of Defendants Barra, Catz, Chang, deSouza, Froman, Iger, Lagomasino, McDonald, Parker, and Rice, and related party non-defendant Everson, a total of eleven (11) individuals.

157.    Plaintiff has not made any demand on the Board to institute this action because a

pre-suit demand on the Disney Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

158.     Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

159.     Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

### Demand is Futile as to Defendant Iger Because of His Principal Professional Occupation as the Company's CEO

160.     Defendant Iger is the Company's CEO and has served in his position as CEO since November 2022. Defendant Iger is also a member of the Board. In his role as CEO of the Company for the fiscal year 2022, Defendant Iger received $14,998,299 in total compensation. The Company does not claim that Defendant Iger is an independent director and because his primary source of income and primary employment is his employment as CEO of Disney and his professional reputation is inextricably bound to his role at Disney. Defendant Iger is incapable of acting independently and demand is futile upon him.

### Demand is Futile as to the Members of the Audit Committee

161.    Demand is futile as to Defendants Catz, deSouza, and Rice (the "Audit Committee Defendants") as members of the Audit Committee during the Relevant Period for their knowing failure to fulfill their responsibilities.

162.    The Board adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee.  The duties and purpose of the Audit Committee are set forth *supra*.

163.    Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings were materially false and misleading when made.

164.    The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information. In their capacity as members of the Audit Committee, the Audit Committee Defendants were charged with ensuring that these reports did not contain such materially misleading information.  By allowing documents to be filled with misleading information, the Audit Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested.  Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

**Demand is Futile as to Defendants Chapek and McCarthy**

165.    Demand is excused as to the Insider Selling Defendants because they directly benefited from the wrongs and acts complained of herein and face a sufficiently substantial likelihood of liability in connection with their illicit insider stock sales detailed above, which were suspicious in timing and amount, and therefore cannot possibly consider a demand to sue themselves based on those transactions in which they reaped significant benefits.

166.    As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings during the Relevant Period, each of the Insider Selling Defendants knew the false and misleading statements made through press releases and in the Company's financial statements during the Relevant Period had caused the Company's stock price to become artificially inflated.   While in possession of this material adverse non-public information regarding the Company, the Insider Selling Defendants participated in the illegal insider selling set forth herein and thereby received personal financial benefits from the challenged insider trading transactions.

167.    The Company has adopted a policy concerning insider trading in the Disney Standards, which states:

> As a Cast Member or employee, your job may expose you to material, nonpublic (or "inside") information about our Company or companies with which we do business. Material inside information is information about a company that is not available to the public but, if it were, might influence someone's investment decision about that company. Examples of material inside information include: information about mergers or acquisitions, financial performance, changes in executive management, significant transactions or new projects contemplated.
>
> You may not trade in Company stock or other securities based on material inside information you have about our Company, and you may not trade in the stock of companies we work with if your job exposes you to inside information about those companies. Passing along a "tip" is also a form of insider trading and strictly prohibited. Keep in mind, even the appearance of an improper transaction must be avoided.

168.    Accordingly, the Insider Selling Defendants have violated the Company's insider trading policies and face a sufficiently substantial likelihood of liability due to their illicit trades, rendering them incapable of considering a demand.

## **Demand is Futile as to the Director Defendants**

169.    Plaintiff has not made any demand on the Board to institute this action because a

pre-suit demand on the Company's Board would be futile, and therefore, excused. This is because a majority of the Board faces a substantial likelihood of liability as a result of their knowing toleration of the above described false and misleading statements and omissions of material adverse facts, which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

170.   Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

171.   Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

172.   Accordingly, the Director Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartiality to consider a demand to sue themselves in the present action.

## COUNT I

### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

173.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

174.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

175.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

176.    Under the direction and watch of the Individual Defendants, the 2021 and 2022 Proxys (the "Proxy Statements") failed to disclose that: (1) contrary to the Proxy Statements' descriptions of the Board's and its committees' oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements about it; and (2) the Individual Defendants violated the applicable Codes of Conduct.

177.    The Proxy Statements were also materially misleading because the facts show that the Board and its committees utterly failed to implement controls to effectively oversee conduct risk relating to the Company's core business, operations and prospects in relation to the conduct alleged herein.

178.     The Individual Defendants knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, the re-election of the Company's directors.

179.     The Company was damaged as a result of the Individual Defendants material misrepresentations and omissions in the Proxy Statements.

180.     Plaintiff on behalf of Disney has no adequate remedy at law.

## COUNT II

**Against the Securities Action Defendants for**
**Contribution Under Section 10(b) of the Exchange Act,**
**Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act**

181.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

182.     As a result of the conduct and events alleged above, Disney has been named as a defendant in the Related Securities Action brought on behalf of Disney shareholders in which it is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10(b)-5 promulgated thereunder.

183.     Federal law provides Disney with a cause of action against other alleged joint tortfeasors under Rule 10b-5.  In particular, under the Supreme Court's decision in *Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U. S. 286, Disney has a federal law right of contribution against joint tortfeasors under Rule 10b-5.  Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling Disney to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the

currently pending Related Securities Action, and sets forth specific rules regarding the determination of claims for such contribution.

184.    Accordingly, Plaintiff, on behalf of Disney, hereby claims contribution against the Securities Action Defendants, each of whom has been named in the currently pending Related Securities Action as a joint tortfeasor with Disney under Rule 10b-5, or if joined in such actions, would be liable for the same damages as Disney.

185.    Disney claims no right to indemnification under the federal securities laws from them in this count, but rather only claims contribution.

**Allegations Regarding the Securities Action Defendants**

186.    Throughout the Relevant Period, the Securities Action Defendants caused the Company to issue false and misleading statements and/or omit material information in public statements and/or Company filings concerning the Company's business and financial prospects. These statements were materially misleading to persons who purchased Disney securities during the Relevant Period.

187.    The plaintiffs in the Related Securities Action allege that they relied, directly or indirectly, upon these false statements and misleadingly omissive disclosures in purchasing Disney securities, and, as a result, suffered damages because value of their investments was distorted by the false and materially omissive statements, and they purchased such securities at such distorted prices.

188.    The damages suffered by said investors were caused by reason of the fact that (i) they were induced to purchase said securities by the false and misleading statements alleged herein, and (ii) the reveal of the true nature of the Company's business and prospects resulted in the decrease in price of its securities, causing the value of shareholders investments to drop.

189.   The plaintiffs in the Related Securities Action were unaware of the false and misleading nature of said statements and omissive disclosures.

190.   When the Securities Action Defendants signed off on or made the false statements and omissive disclosures detailed herein, they had actual knowledge that they were false and misleading.  As alleged in detail herein, due to their positions as employees and/or directors of Disney, the Securities Action Defendants were privy to information regarding the Company's business and financial prospects and would have been aware that the statements made were in fact false and misleading when made.

191.   Accordingly, the Securities Action Defendants are liable for damages under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and, if Disney were to be held liable in the Related Securities Action, the Securities Action Defendants would be liable to it for contribution.  Plaintiffs hereby derivatively claim such right of contribution on behalf of Disney.

**Allegations Regarding the Securities Action Defendants as Control Persons**

192.   In acting as alleged above, the Securities Action Defendants were acting as authorized agents of Disney in their roles as directors and/or employees.  Because of their positions of control and authority as senior officers and/or directors, the Securities Action Defendants were able to, and did, control the contents of the various reports, press releases and public filings disseminated by the Company throughout the Relevant Period, as alleged herein.

193.   The Securities Action Defendants were "controlling persons" of Disney within the meaning of Section 20(a) of the Exchange Act, and, accordingly, the Securities Action Defendants could be held liable to the plaintiffs in the Related Securities Action.  Were the Company to be held liable in said Related Securities Action, the Securities Action Defendants would be liable to it for contribution.

194.    Plaintiff hereby derivatively claims such right of contribution on behalf of Disney.

## COUNT III

### Against the Individual Defendants for Breaches of Fiduciary Duty

195.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

196.    The Individual Defendants owed and owe Disney fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Disney the highest obligation of good faith, loyalty, and due care.

197.    The Individual Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to Disney shareholders materially misleading and inaccurate information through the Company's SEC filings throughout the Relevant Period.  These actions could not have been a good faith exercise of prudent business judgment.

198.    During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Disney to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to Disney and its shareholders.  As a result, the Individual Defendants grossly mismanaged the Company.

199.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

200.    Plaintiff, on behalf of Disney, has no adequate remedy at law.

## COUNT IV

### Against the Insider Selling Defendants for Breach
### of Fiduciary Duties for Insider Trading and Misappropriation of Information

201.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

202.    The Insider Selling Defendants, throughout the Relevant Period, engaged in the sale of Company stock at artificially inflated prices while in possession of material information that had yet to be released to the investing public.  These Defendants participated in the scheme to keep the public unaware of the adverse information affecting the Company's stock price and benefited to the detriment of the investing public and the Company itself.

203.    This proprietary, non-public information concerning the Company's business and prospects was known by Defendants who sold large quantities of their shares throughout the Relevant Period and was done for their own self-interests, at the expense of Disney and the investing public.

204.    By selling the Company's common stock while in possession of this information and failing to fully inform the investing public, the Insider Selling Defendants breached their fiduciary duties of good faith and loyalty to the Company.

205.    As such, the Insider Selling Defendants are legally responsible to the Company for the significant profits they received from the sales of their stock in Disney.

## COUNT V

### Against the Securities Action Defendants for Unjust Enrichment

206.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

207.    By his wrongful acts and omissions, the Securities Action Defendants were unjustly

enriched at the expense of and to the detriment of Disney.

208. The Securities Action Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Disney.

209. Plaintiff, as a shareholder and representative of Disney, seeks restitution from the Securities Action Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Securities Action Defendants from their wrongful conduct and breaches of fiduciary duty.

210. Plaintiff, on behalf of Disney, has no adequate remedy at law.

## COUNT VI

### Against the Individual Defendants for Waste of Corporate Assets

211. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

212. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

213. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things: (a) paying excessive compensation and bonuses to certain executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Related Securities Action.

214. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

215. Plaintiff, on behalf of the Company, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

   A. Declaring that Plaintiff may maintain this action on behalf of Disney and that Plaintiff is an adequate representative of the Company;

   B. Determining and awarding to Disney the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

   C. Directing Disney and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Disney and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

    (1) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

    (2) a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

   D. Determining and awarding to Disney exemplary damages in an amount necessary to punish Defendants and to make an example of Defendants to the community according to proof at trial;

E.    Awarding Disney restitution from Defendants, and each of them;

F.    Awarding Disney Contribution from the Securities Action Defendants, and each of them;

G.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.    Granting such other and further equitable relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: August 23, 2023                                    Respectfully submitted,

                                                         **BIELLI & KLAUDER, LLC**

                                                         */s/ Ryan M. Ernst*
                                                         Ryan M. Ernst (#4788)
                                                         1204 N. King Street
                                                         Wilmington, DE 19801
                                                         (302) 803-4600
                                                         rernst@bk-legal.com

OF COUNSEL:

Joshua M. Lifshitz
**LIFSHITZ LAW PLLC**
1190 Broadway
Hewlett, New York 11557
Telephone: (516) 493-9780
Facsimile: (516) 280-7376

*Attorneys for Plaintiff*